**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MEL REYNOLDS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-5613 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| ELZIE L. HIGGINBOTTOM, ROBERT | ) | |
| MUGABE, CHRISTOPHER | ) | |
| MUTSVANGWA, EAST LAKE | ) | |
| MANAGEMENT & DEVELOPMENT, | ) | |
| INC., ELH-HHH, LLC, BURLING | ) | |
| BUILDERS, INC., WILCAR, LLC, | ) | |
| TURTLE CREEK MINING & | ) | |
| TRADING COMPANY, INC., WALTER | ) | |
| MZEMBI, MARTIN MUNAGATIRE, | ) | |
| HENRY MUNAGATIRE, HAPPYTON | ) | |
| M. BONYONGWE, MONICA | ) | |
| MUTSVANGWA, ARTHUR | ) | |
| MUTAMBARA, JOHN GIRZADES, and | ) | |
| GLORIA SCARDINO, | ) | |
| | ) | |
| Defendants. | ) | |

_____

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff Mel Reynolds, a former Congressman, sued the former President of Zimbabwe (Robert Mugabe) and a collection of Zimbabwe security officials, plus a group of Chicago businesspeople and their companies. He claims that he planned to blow the whistle on a bribery scheme involving the sale of blood diamonds from Zimbabwe. And when he refused to keep quiet, the defendants conspired to have him arrested and tortured.

Reynolds sued the defendants under the Torture Victim Protection Act. That statute authorizes claims against individuals who, acting under authority or color of law of any foreign nation, subject another person to torture.

The Chicago Defendants moved to dismiss.  For the reasons stated below, the motion to dismiss is granted.

## Background

At the motion to dismiss stage, the Court must accept as true the well-pleaded allegations of the complaint.  *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020).  The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint."  *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

At the outset, this Court offers one overarching observation.  The allegations of the complaint are not your everyday, run-of-the-mill sort of allegations.  The thrust of the case involves a former Congressman who was arrested and tortured for ratting out an illegal diamond operation in Zimbabwe.  The story is pretty far out there.

A complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*

Plausibility is not about the probability of success.  "Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of" a claim. *Twombly*, 550 U.S. at 556.

Plausibility is about including enough facts so that the claim is not conclusory.  "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact) . . . ."  *Id.* at

2

555; *see also Iqbal*, 556 U.S. at 681 ("To be clear, we do not reject these bald allegations on the ground that they are unrealistic or nonsensical. . . . It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth."); *Neitzke v. Williams*, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations."). Plausibility is about putting meat on the bone, from a factual standpoint.

"And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *See Twombly*, 550 U.S. at 556. "The sole exception to this rule lies with allegations that are sufficiently fantastic to defy reality as we know it: claims about little green men, or the plaintiff's recent trip to Pluto, or experiences in time travel." *Iqbal*, 556 U.S. at 696 (Souter, J., dissenting). One wonders where the little-green-men line is.

Truth is sometimes stranger than fiction. And here, the nature of the claim invites unusual facts. The complaint includes claims under the Torture Victim Protection Act, and it is hard to imagine how a plaintiff could bring a claim under that statute without including facts that seem pretty far out there. So this Court will take the well-pleaded facts at face value, and assume that they are true.

Defendant Elzie Higginbottom is a Chicago businessman who was interested in doing business in Africa. *See* Cplt., at ¶¶ 7, 27–28 (Dckt. No. 48).[1] Plaintiff Mel Reynolds is a former member of the U.S. House of Representatives who fostered relationships with African leaders during his career in public service. *Id.* at ¶¶ 23–26. He has a number of federal criminal convictions to his name.

---

[1] Citations to the complaint are to the unredacted, sealed version found on pages 64 through 89 in docket number 48.

In 2010, Higginbottom hired Reynolds to do consulting work in Africa. *Id.* at ¶ 28. The idea was that Reynolds would introduce Higginbottom to key African leaders, and hopefully open the door for his business ventures. *Id.* at ¶ 31.

Reynolds's consulting work for Higginbottom took him to Zimbabwe numerous times over the next few years. *Id.* at ¶ 29. The trips supported several different business ventures for Higginbottom, including providing disposable medical examination gloves to the Zimbabwean health care system. *Id.*

Reynolds delivered on his consulting promises: he introduced Higginbottom to Robert Mugabe, the (former) President of Zimbabwe. *Id.* at ¶¶ 8, 30. Reynolds also introduced Higginbottom to Happyton M. Bonyongwe, the head of the Zimbabwe Central Intelligence Organization ("CIO"). *Id.* at ¶¶ 10, 30. And finally, Reynold introduced him to Christopher Mutsvangwa, an "organizing member" of the Zimbabwe CIO, among others. *Id.* at ¶¶ 9, 30.

But soon, Higginbottom started making moves that put Reynolds on edge.

First, Higginbottom began paying money to Zimbabwean officials under the table. *Id.* at ¶¶ 31, 34–35, 39, 45. Higginbottom made some of the payments in private meetings, without Reynolds around. *Id.* at ¶¶ 31, 39. But on other occasions, Reynolds saw Higginbottom hand over the money, including one meeting where Higginbottom gave a check to then-President Mugabe. *Id.* at ¶¶ 34–35, 45. Reynolds confronted Higginbottom about the payment to Mugabe, warning that such payments would violate United States law. *Id.* at ¶ 36. Higginbottom angrily told Reynolds that he would do what he wanted with his money. *Id.*

Second, Reynolds found out that Higginbottom was trying to get a diamond mine concession in Zimbabwe. *Id.* at ¶¶ 32–33, 37–42. A diamond mine concession is essentially permission to mine, extract, and sell diamonds.

That attempt concerned Reynolds. Zimbabwe diamonds are on the United States sanctions list, and doing business in Zimbabwean diamonds violates federal law. *Id.* at ¶ 42. Reynolds wanted no part of any diamond mining deal in Zimbabwe. As Reynolds saw it, Higginbottom had dragged him into an illegal business without his knowledge or approval. Higginbottom exploited Reynolds's Zimbabwean political contacts with key figures like President Mugabe and Mutsvangwa – who was chairman of a Zimbabwean government department that controlled mineral transactions – to obtain an illegal diamond mine concession. *Id.* at ¶¶ 32, 35, 39, 42.

Reynolds confronted Higginbottom about his diamond mine concession in the summer of 2013. *Id.* at ¶ 42. At the time, Reynolds was living in a hotel in Zimbabwe, working on an unrelated business project. *Id.* During a phone call, Reynolds told Higginbottom that he had to call off the diamond mine deal, or else Reynolds would expose everything to the authorities in the United States. *Id.*

Higginbottom responded that he was sending Mutsvangwa to talk things over with Reynolds, and pressed Reynolds to consider the "deal" that Mutsvangwa would propose. *Id.* at ¶ 43. The "deal" was a bribe. Speaking on Higginbottom's behalf, Mutsvangwa offered Reynolds $500,000 in cash, along with a new home for Reynolds in Zimbabwe or South Africa, as long as Reynolds stayed quiet about the diamond deal. *Id.* Reynolds refused. *Id.*

But that wasn't the end of it. Mutsvangwa and Reynolds stayed in close contact, and in November 2013, Mutsvangwa sweetened the deal. In exchange for his silence, Higginbottom offered to pay Reynolds $1,000,000 in cash, plus a separate pot of money to buy property in Africa and a $600,000 home for Reynolds and his three children in Chicago. *Id.* at ¶ 44. Reynolds again refused. *Id.*

Mutsvangwa then threatened Reynolds, telling him that if he didn't play ball, Higginbottom would use his political connections in the United States to have Reynolds charged with federal crimes and "locked up" when he returned to the United States. *Id.* Still, Reynolds refused.

A few months later, the Zimbabwean CIO and police officers barged into Reynolds's hotel room in Harare, Zimbabwe, with AK-47's drawn. *Id.* at ¶ 49. They arrested him for immigration visa violations. *Id.* They didn't have a warrant. *Id.*

Mutsvangwa later admitted in a news article that he pre-planned and staged his arrest. *Id.* And Mutsvangwa had help. Higginbottom worked with Mutsvangwa to plan and fund Reynolds's arrest and charges. *Id.* at ¶ 57.

Once in jail, Reynolds suffered beatings, sleep deprivation, and unsanitary conditions. *Id.* at ¶¶ 50–51. He was not allowed to sleep at night, and he was awakened each time he started to doze off. *Id.* at ¶ 50. He stayed in the Zimbabwean jail for six days. *Id.* at ¶¶ 50, 53.

The complaint alleges that Reynolds was "verbally abused" by "other inmates and prison guards." *Id.* The complaint also alleges that Reynolds "was beaten." *Id.* The use of the passive voice obscures who inflicted the beating – the guards, or other inmates, or both. The Court reads the complaint to allege that the guards delivered the blows (and perhaps other inmates, too).

On several occasions, guards beat Reynolds in the upper chest while he was handcuffed, causing long-term damage to his right collarbone. *Id.* Several times, guards and inmates held Reynolds down while guards beat his bare feet with a thick leather strap. *Id.* He was once pushed, punched, and kicked into a rusty metal latrine, deeply lacerating his left foot. *Id.* Denied any medical treatment, the wound developed into a life-threatening infection. *Id.*

Reynolds had several court appearances during his brief imprisonment. *Id.* at ¶ 51. On more than one occasion when he returned from court, the guards strip-searched Reynolds, and left him lying on the concrete floor of a solitary confinement cell, without a toilet, for several hours. *Id.* He was forced to lie in his own waste. *Id.*

Shortly after the CIO and police arrested Reynolds, they charged him with possession of censored items. *Id.* at ¶ 52. This charge was quickly dropped because the CIO and police had no evidence that Reynolds had any prohibited items. *Id.* Eventually, a Zimbabwe court ordered Reynolds to be fined $100 and deported for overstaying his visa. *Id.* at ¶ 53.

The deportation order came down on a Friday, but Zimbabwe prosecutors told the court that the next flight out of the country would not be until Monday. *Id.* Reynolds later learned that Zimbabwe authorities were planning to file espionage charges against him, with the potential of a life sentence. *Id.* Thankfully for Reynolds, a Zimbabwe politician who was opposed to then-President Mugabe sprang Reynolds from the jail early, and got him on a plane to South Africa on Sunday night – before espionage charges could be filed. *Id.*

Reynolds recuperated in a South African hospital from his injuries, but he has never fully recovered. *Id.* at ¶¶ 54–55. He was diagnosed with Post Traumatic Stress Disorder. *Id.* at ¶ 55. And he continues to suffer severe chronic arthritic pain in his upper torso and shoulder due to his collarbone injury. *Id.* He complains of constant pain due to injuries from the beatings. *Id.*

Reynolds later filed this lawsuit, bringing claims against a slew of Defendants. *Id.* at ¶¶ 7–22. Reynolds sued Higginbottom, several of Higginbottom's companies (East Lake Management & Development Corp., ELH-HHH, LLC, Burling Builders, Inc., Wilcar, LLC, and Turtle Creek Mining & Trading Company Inc.), and employees of Higginbottom's companies

(John Girzades and Gloria Scardino). This Court will refer to that group as the "Chicago Defendants."

Reynolds also sued several Zimbabwean government officials and citizens (Mugabe, Mutsvangwa, Bonyongwe, Martin Munangatire, Henry Munangatire, Arthur Mutambara, Walter Mzembi, Monica Mutsvangwa, and Farai Jere). The Court will refer to them as the "Zimbabwe Defendants."

Reynolds claimed that all of the Defendants violated the Torture Victim Protection Act when he was abused in Zimbabwe. *Id.* at ¶ 58. The Chicago Defendants, in turn, moved to dismiss on a number of grounds. *See* Defs.' Mtn. to Dismiss (Dckt. No. 24). The Zimbabwe Defendants did not respond to the complaint. Based on the docket, they were never served with process. *See* Status Report (Dckt. No. 51).

## Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not the merits of the case. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a motion to dismiss, the Court must accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive, the complaint must give the defendant fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

When reviewing a motion to dismiss under Rule 12(b)(6), a district court may consider "the complaint itself, documents attached to the complaint, documents that are critical to the

complaint and referred to in it, and information that is subject to proper judicial notice."

*Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012).

## Analysis

Reynolds claims that the Defendants violated the Torture Victim Protection Act ("TVPA"). Congress enacted the TVPA to "create[] an express cause of action for victims of torture and extrajudicial killing in violation of international law." *See Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1398 (2018). Section 2 of the Act establishes a civil action for foreign extrajudicial killing or torture:

> (a) Liability. – An individual who, under actual or apparent authority, or color of law, of any foreign nation –
>
> > (1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or
> >
> > (2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death.

*See* Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (1992), *codified at* 28 U.S.C. § 1350 note § 2(a). Notice the first noun – the Act applies to an "individual." *Id.*

Section 3 defines "torture" to mean the unlawful infliction of severe pain or suffering while in custody for certain coercive purposes. Specifically:

> The term "torture" means any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind.

*Id.* at note § 3(b)(1).

A TVPA claim requires proof that (1) an individual (2) subjected the plaintiff to torture (3) under authority or color of law of a foreign nation.  *See* 28 U.S.C. § 1350 note § 1(a); *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 459 (2012) ("[T]he Act does not impose liability on perpetrators who act without authority or color of law of a foreign state.").

The Act sets a 10-year statute of limitations.  *See* 28 U.S.C. § 1350 note § 2(c).  And it requires a plaintiff to first exhaust "adequate and available remedies in the place in which the conduct giving rise to the claim occurred."  *Id.* at note § 2(b).

The Chicago Defendants advance four arguments for dismissal.  First, they seek dismissal of the corporate defendants because the TVPA applies only to natural persons.  Second, they argue that the complaint does not allege that the Chicago Defendants acted under color of Zimbabwean law.  Third, they contend that the complaint does not allege that they subjected Reynolds to torture, and that there is no aiding and abetting liability under the TVPA.  Fourth, they argue that the complaint does not allege facts that amount to torture.  The Court takes each argument in turn.

## I.      Corporate Defendants

The Chicago Defendants argue that the TVPA applies to people, not companies, so any claims against corporate defendants must be dismissed.  *See* Mem. in Supp. of Mtn. to Dismiss, at 7 (Dckt. No. 25).  The Court agrees.

The TVPA authorizes a claim against an "individual."  *See* 28 U.S.C. § 1350 note § 2(a).  The Supreme Court has held that the word "individual" under the TVPA refers only to natural persons.  *See Mohamad*, 566 U.S. at 461.  In common usage, the term "individual" means a natural person, and nothing in the statutory text supports a broader reading.  *Id.* at 453–56.

"The ordinary meaning of the word, fortified by its statutory context, persuades us that the Act authorizes suit against natural persons alone."  *Id.* at 453–54; *id.* at 456 ("[T]he text of

the statute persuades us that the Act authorizes liability solely against natural persons.").  Based on the plain meaning of the term "individual," the TVPA does not create liability for corporations, LLCs, or any other type of entity.  *Id.*; *see also Mastafa v. Chevron Corp.*, 770 F.3d 170, 177–78 (2d Cir. 2014); *Bowoto v. Chevron Corp.*, 621 F.3d 1116, 1128 (9th Cir. 2010).

Several of the Chicago Defendants are companies, not natural persons.  East Lake Management & Development, Inc., ELH-HHH, LLC, Burling Builders, Inc., Wilcar, LLC, and Turtle Creek Mining & Trading Company, Inc. are all companies.  Based on the text of the statute, they cannot have liability under the TVPA, so they are dismissed with prejudice.

## II.    Individual Defendants

After dismissing the entities, three Chicago Defendants remain:  Elzie Higginbottom, Gloria Scardino, and John Girzades.

Higginbottom is the main defendant.  The complaint alleges that Higginbottom is a Chicago businessman who orchestrated a series of bribes to Zimbabwe officials to get access to "Blood Diamonds."  *See* Cplt., at ¶ 8 (Dckt. No. 48).

The latter two Defendants, Scardino and Girzades, barely have a toehold in the complaint.  Reynolds alleges that they are "associates" of Higginbottom and helped him distribute bribes to Zimbabwean officials.  *Id.* at ¶ 45.  The complaint accuses them of aiding and abetting by playing a role in the distribution of bribes.  *Id.* at ¶¶ 16–17.  Basically, Scardino wrote the checks, and Girzades delivered them.

Scardino was the Treasurer of Higginbottom's companies, including Eastlake Management.  *Id.* at ¶ 17.  She allegedly wrote some of the checks to Mutsvangwa.  *Id.*; *see also id.* at ¶ 45 (referring to illegal payments to Zimbabwe officials through "checks written out by Higginbottom and the Eastlake Management Treasurer, Gloria Scardino").

11

Girzades was a Vice President of one of Higginbottom's companies (the complaint does not reveal which one). *Id.* at ¶ 45. He allegedly received money from Higginbottom, and distributed the funds to Mutsvangwa and others during "several trips to Zimbabwe." *Id.*; *see also id.* at ¶ 16.

The three individual Chicago Defendants move to dismiss on three grounds. First, Defendants argue that the Act does not apply because they are private U.S. citizens. Second, they contend that the complaint does not allege that they subjected Reynolds to torture. Third, they argue that the alleged conduct does not constitute torture.

### A. Under Authority of Foreign Law

First, Higginbottom, Scardino, and Girzades argue that the TVPA does not apply because they are "private U.S. citizens" and thus *cannot* act under color of foreign law. *See* Mem. in Supp. of Mtn. to Dismiss, at 6–7 (Dckt. No. 25). That argument has two components. The first part is the notion that the Act applies to foreigners, not Americans. The second part is the notion that the Act does not apply to private actors.

The first argument runs into trouble after reading only a few words of the statute. Congress authorized an action against an "individual" who subjects someone else to torture under authority or color of foreign law. *See* 28 U.S.C. § 1350 note § 2. That word is inclusive, and the surrounding text imposes no limitation. The breadth of that term stands in contrast to a phrase that follows: "*foreign* nation." *Id.* (emphasis added).

The Act applies to an individual who acts under authority or color of a foreign nation. Congress did not confine the Act to *foreign* individuals. The text refers to "[a]n individual" and "any *foreign* nation." *Id.* (emphasis added). It would have been easy for Congress to repeat that adjective, and restrict the Act to foreign individuals who act on behalf of a foreign nation. But no such limitation appears in the text.

12

True, it's not easy to imagine a scenario when a U.S. citizen could act under authority or color of foreign law. But it's not categorically out of bounds, either. Under the text, if an American acts under authority or color of foreign law, then that person could fall within the parameters of the statute. American citizenship comes with all sorts of blessings, but immunity under the TVPA isn't one of them.

The Chicago Defendants rely on a sentence from the D.C. Circuit's decision in *Saleh v. Titan Corp.*, 580 F.3d 1 (D.C. Cir. 2009), which involved a claim under the Alien Tort Statute (not the TVPA). Along the way, the D.C. Circuit included the following dicta: "Perhaps most relevant is the TVPA, in which Congress provided a cause of action whereby U.S. residents could sue foreign states for torture, but did not – and we must assume that was a deliberate decision – include as possible defendants either American government officers or private U.S. persons, whether or not acting in concert with government employees." *Id.* at 16. The D.C. Circuit cited a signing statement from President H.W. Bush, who confirmed that the statute does not apply to U.S. military personnel. *Id.*; *see also* Statement by President of the United States, *Statement by President George [H.W.] Bush upon Signing H.R. 2092,* 1992 U.S.C.C.A.N. 91 (Mar. 12, 1992) ("I am signing the bill based on my understanding that the Act does not permit suits for alleged human rights violations in the context of United States military operations abroad . . . .").

It is true that the statutory text did not expressly include "either American government officers or private U.S. persons." *Saleh*, 580 F.3d at 16. But the text did not exclude them, either. Instead, it used an all-encompassing word: "individual."

More to the point, reading the Act to apply to all individuals, including Americans, does not expose United States military personnel, intelligence agencies, or their contractors to

liability. American military and intelligence agencies act under color of American law, not foreign law, and thus they face no liability under the Act. Anyone acting on behalf of the United States government has no liability. The lack of liability stems not from the fact that they are not "individual[s]," but from the fact that they do not act under color of foreign law.

The other part of the argument from the Chicago Defendants involves the rest of the statutory text. The TVPA only applies to individuals who act "under actual or apparent authority, or color of law, of any foreign nation." *See* 28 U.S.C. § 1350 note § 2(a). "Any allegation arising under the TVPA requires a demonstration that the defendants acted under color of foreign law, or under its authority." *Arar v. Ashcroft*, 585 F.3d 559, 568 (2d Cir. 2009) (quoting *Kadic v. Karadzic,* 70 F.3d 232, 245 (2d Cir. 1995)).

The phrases "actual or apparent authority" and "color of law" are common parlance in agency and civil rights law. So courts "look to 'principles of agency law and to jurisprudence under 42 U.S.C. § 1983'" to determine whether defendants acted under actual or apparent authority, or acted under the color of law of a foreign nation. *See Chowdhury v. Worldtel Bangladesh Holding, Ltd.*, 746 F.3d 42, 52 (2d Cir. 2014) (quoting *Kadic*, 70 F.3d at 245).

"'For purposes of the TVPA, an individual acts under color of law . . . when he acts together with state officials or with significant state aid.'" *Id.* at 52–53 (quoting *Khulumani v. Barclay Nat. Bank Ltd.*, 504 F.3d 254, 260 (2d Cir. 2007)). A plaintiff "must adequately allege that the defendants possessed power under [foreign] law, and that the offending actions . . . derived from an exercise of that power, or that defendants could not have undertaken their culpable actions absent such power." *Arar*, 585 F.3d at 568.

A foreign official acts under color of foreign law when exercising official responsibilities. *See West v. Atkins*, 487 U.S. 42, 50 (1988) ("[G]enerally, a public employee

14

acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law."). Private actors, on the other hand, typically do not act under color of foreign law.

Private actors usually are not public actors, but that general rule has exceptions. "[A] private entity can qualify as a state actor in a few limited circumstances – including, for example, (i) when the private entity performs a traditional, exclusive public function . . . ; (ii) when the government compels the private entity to take a particular action . . . ; or (iii) when the government acts jointly with the private entity." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019) (citations omitted); *see also Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 815–16 (7th Cir. 2009). Whether a private defendant falls within any of these categories depends on the facts, as "the criteria lack rigid simplicity." *See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001); *Tarpley v. Keistler*, 188 F.3d 788, 791 (7th Cir. 1999). There must be "such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Brentwood Acad.*, 531 U.S. at 295 (cleaned up).

The complaint at hand involves the third possibility – *i.e.*, that the Chicago Defendants acted jointly with the Zimbabwean government. A private citizen may act under color of foreign law if he "conspired with a public employee" to violate the TVPA. *See Proffitt v. Ridgway*, 279 F.3d 503, 507 (7th Cir. 2002); *see also Dennis v. Sparks,* 449 U.S. 24, 27–28 (1980); *Brokaw v. Mercer County,* 235 F.3d 1000, 1016 (7th Cir. 2000). "As a conspirator, the citizen is liable, in civil as in criminal law, for the wrongful acts of the other conspirators committed within the scope of the conspiracy." *Id.* (citing *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988)) (other citations omitted).

In *Adickes v. S. H. Kress & Co.*, 398 U.S. 144 (1970), the Supreme Court confirmed that a "private party involved in such a conspiracy [to violate constitutional rights], even though not an official of the State, can be liable under § 1983." *Id.* at 152. "'Private persons, jointly engaged with state officials in the prohibited action, are acting "under color" of law for purposes of the statute. To act "under color" of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents.'" *Id.* (quoting *United States v. Price*, 383 U.S. 787, 794 (1966)).

Bribery is a classic example. In *Dennis v. Sparks*, 449 U.S. 24 (1980), the Supreme Court confronted a case about private parties who bribed a judge to obtain an injunction. The defendants moved to dismiss on the ground that they were private parties, and thus did not act "under color of" state law within the meaning of section 1983.

The Supreme Court confirmed that private individuals can act under color of law, even though they do not hold any position in government. It all depends on the facts. "[T]o act 'under color of' state law for § 1983 purposes does not require that the defendant be an officer of the State. It is enough that he is a willful participant in joint action with the State or its agents. Private persons, jointly engaged with state officials in the challenged action, are acting 'under color' of law for purposes of § 1983 actions." *Id.* at 27–28.

The Supreme Court held that the private individuals counted as state actors because they conspired with the judge and obtained state action (a ruling) through bribery. *Id.* at 28. "[T]he allegations were that an official act of the defendant judge was the product of a corrupt conspiracy involving bribery of the judge. Under these allegations, the private parties conspiring with the judge were acting under color of state law . . . . Private parties who corruptly conspire with a judge in connection with such conduct are thus acting under color of state law within the

16

meaning of § 1983 as it has been construed in our prior cases." *Id.* at 28–29; *see also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 931 (1982) (holding that a "private party's joint participation with a state official in a conspiracy to discriminate" would satisfy the "under color of law" requirement) (cleaned up).

Even so, not every interaction with a state official transforms a private actor into a public actor. "It is well-established that '[a] private party does not act under color of state law when she merely elicits but does not join in an exercise of official state authority.'" *Moody v. Farrell*, 868 F.3d 348, 353 (5th Cir. 2017) (quoting *Daniel v. Ferguson*, 839 F.2d 1124, 1130 (5th Cir. 1988)). Private citizens do not act under color of foreign law, for example, by filing and winning a lawsuit, helping law enforcement, or even providing false information to law enforcement. *See Dennis*, 449 U.S. at 28; *Moody*, 868 F.3d at 353; *Mateunas v. Piland*, 182 F.3d 922 (7th Cir. 1999).

Those principles provide the guideposts for the case at hand. Reynolds alleges that the Chicago Defendants, led by Higginbottom, worked with the Zimbabwe Defendants to get an illegal diamond concession. *See* Cplt., at ¶¶ 31–42 (Dckt. No. 48). When Reynolds threatened to expose the plan to United States authorities, Higginbottom and his associates conspired with the Zimbabwe Defendants to bribe Reynolds into staying silent. *Id.* at ¶¶ 43–44.

Higginbottom sent Mutsvangwa to meet with Reynolds twice over the span of a few months. He offered cash and houses for Reynolds and his family, if he would keep quiet about the diamond mining deal. *Id.* When Reynolds refused Higginbottom's bribes for the second time, Mutsvangwa threatened Reynolds:

> Mutsvangwa then looked Plaintiff directly in the eyes and said that Higginbottom was not playing games and if Plaintiff did not agree Higginbottom would use his Government and law enforcement contacts in America to have Plaintiff charged with federal crimes and have Plaintiff "locked up" upon Plaintiff's arrival back into the United States.

*Id.* at ¶ 44. Reynolds still refused the bribes. *Id.*

If the allegations stopped there, Reynolds wouldn't have a claim, at least not under the TVPA. That paragraph alleged that Higginbottom threatened to use his contacts in the *United States* to lock up Reynolds. Even if an arrest in America had taken place, it would not give rise to a claim under the TVPA because it would not involve acting under color of law "of any *foreign* nation." *See* 28 U.S.C. § 1350 note § 2(a) (emphasis added).

But the complaint adds more. Higginbottom and the Zimbabwe Defendants conspired to arrest Reynolds in Zimbabwe on false charges, with a plan to lock him away for good on espionage charges. *See* Cplt., at ¶¶ 49–53, 57 (Dckt. No. 48).

Soon after Reynolds refused the first bribe offered by Mutsvangwa, but before he refused the second, several of the Zimbabwe Defendants met at the CIO headquarters to talk about how to deal with Reynolds. *Id.* at ¶ 57. A former official from the Zimbabwe CIO relayed details about the meeting in an affidavit. *See* Tachiveri Aff. (Dckt. No. 48, at 97–99 of 130).

According to that affidavit (which Reynolds attached to the complaint, so it's fair game), CIO head Happyton Bonyongwe and Mutsvangwa attended the meeting. *Id.* at ¶ 5. Mutsvangwa did most of the talking. *Id.* at ¶ 6. He explained that they had to stop Reynolds from telling United States authorities about Higginbottom's business dealings in Zimbabwe, especially the diamond mining deal that Higginbottom was pursuing with President Mugabe. *Id.* at ¶¶ 6–7.

"[I]n that meeting, it was discussed as to the best means to get rid of the Reynolds' [sic] Problem[,] as the matter was referred to. From having Mr. Reynolds arrested for visa violations

to having him held indefinitely on espionage charges in Zimbabwe." *Id.* at ¶ 8. Ominously, the group discussed the possibility that Mr. Reynolds might get hurt: "The fact that Mr. Reynolds was a former American federal official was also discussed regarding any physical harm that would befell [sic] Mr. Reynolds while in custody." *Id.*

The group continued planning over the next few months. Bonyongwe and Mutsvangwa met with Higginbottom in Zimbabwe and in America. *Id.* at ¶ 6. Higginbottom provided the funding for the eventual operation. *Id.* at ¶ 9.

In February 2014, Zimbabwe security forces arrested Reynolds and threw him in jail, where he was physically abused. *See* Cplt., at ¶¶ 49–51 (Dckt. No. 48). While in custody, Reynolds was "humiliated worldwide by being paraded back from the prison to the Court with other prisoners" for various hearings, "while Plaintiff was in filthy prison garments and touted to the public as the former US Congressman which was further used as publicity by the Zimbabwe government." *Id.* at ¶ 51.

The complaint pins the blame on Higginbottom. "Plaintiff was subjected to this treatment of physical beatings and psychological torture for 6 full days. Having Plaintiff treated in this manner was all part of the plan concocted by Higginbottom and Mutsvangwa with the assistance of others in Zimbabwe as their scheme not only to totally discredit Plaintiff, but their illicit conspiracy to have Plaintiff eventually charged with espionage and thereafter imprisoned in Zimbabwe for life." *Id.*

The allegations include enough facts to support an inference that Higginbottom was a state actor when it came to the *arrest*. A private actor ordinarily is not a state actor. But a private actor who bribes a public official for state action becomes a state actor, at least for the subject of the bribe. *See Dennis*, 449 U.S. at 27–28. Bribery changes the private actor's hat.

19

And here, the complaint alleges that Higginbottom bribed Zimbabwe officials for access to diamonds.  *See* Cplt., at ¶ 35 (Dckt. No. 48).  When Reynolds wouldn't keep quiet, Higginbottom tried to bribe him.  *Id.* at ¶¶ 43–44.  And when that didn't work, he paid to have him arrested.  "The operation to arrest and incarcerate Plaintiff was solely financed by Higginbottom . . . ."  *Id.* at ¶ 57; *see also* Tachiveri Aff., at ¶ 4 (Dckt. No. 48, at 97 of 130) ("Former Ambassador Christopher Mutsvangwa and an American Businessman Elzie Higginbottom were the main forces that paid for and organised what happened to Mr. Reynolds.").

One final step remains.  The TVPA covers torture, not false arrest.  An allegation of a conspiracy to commit a false arrest is not enough to state a claim.  A complaint needs to come forward with sufficient facts to support a reasonable inference of a conspiracy to subject someone to torture.

An allegation that Higginbottom conspired with Zimbabwe officials to have Reynolds arrested is not exactly the same thing as an allegation of a conspiracy to torture.  And the complaint does not come out and say that Higginbottom paid the Zimbabwe government to torture Reynolds.  *Id.* at ¶¶ 50–51.

But at the pleading stage, the Court must read the complaint in the plaintiff's favor, including all reasonable inferences.  And here, it is a reasonable inference that the conspiracy to arrest included roughing up Reynolds while in jail to keep him quiet.  The allegations involve corruption and bribes for an illegal diamond operation with the highest levels of the Zimbabwe government, a dictatorship.  No one thinks that a jail in Zimbabwe is going to be Club Fed.

The complaint includes enough facts to tell a plausible story that Higginbottom acted under color of foreign law.  But Scardino and Girzades stand on a different footing.  The

complaint alleges that they helped play a role in the bribery scheme, by writing checks and delivering them to officials from the Zimbabwe government. But the complaint does not allege that they played any role in Reynolds's arrest. There is no allegation that they wrote or delivered a check connected to the arrest or torture of Reynolds. Without that link, there is no claim.

The Court concludes that the complaint includes enough facts to allege that Higginbottom acted under authority or color of foreign law. But the complaint does not include enough facts to support that inference for Scardino and Girzades. So the claim against them is dismissed.

### B.     Subjecting an Individual to Torture

The next question is whether the complaint alleges that Higginbottom (the only remaining Chicago Defendant) subjected Reynolds to torture within the meaning of the statute. *See* 28 U.S.C. § 1350 note § 2(a)(1).

The TVPA reaches any "individual who . . . subjects an individual to torture." *See* 28 U.S.C. § 1350 note § 2(a)(1). The Act does not define what it means to "subject[]" someone to torture. Generally speaking, to "subject" someone to something means "[t]o cause to undergo some action, agent, or operation." *See* Subject, Black's Law Dictionary (11th ed. 2019).[2]

The complaint does not allege that any of the Chicago Defendants personally tortured Reynolds. But the Act is not limited to people who *do* the torturing. The text does not say an "individual who tortures." Instead, the Act reaches anyone who "subjects" an individual to torture. *See* 28 U.S.C. § 1350 note § 2(a)(1).

That phraseology covers people who order a subordinate to torture someone else. "[T]he TVPA contemplates liability against officers who do not personally execute the torture or

---

[2] Congress adopted the TVPA in 1992. The edition of Black's Law Dictionary from 1999 does not include a definition of the verb "subject." So this Court relies on a more recent edition. There is no reason to think that the meaning of "subject" has changed in the meantime.

extrajudicial killing." *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 458 (2012) (citing *Chavez v. Carranza*, 559 F.3d 486 (6th Cir. 2009)). "An officer who gives an order to torture" has subjected the individual to torture, and thus bears responsibility. *Id.*; *see also Application of Yamashita*, 327 U.S. 1, 15–16 (1946).

The Seventh Circuit has not addressed what it means to "subject[]" an individual to torture. *See* 28 U.S.C. § 1350 note § 2(a)(1). Several other circuits have applied the "command responsibility" doctrine when construing the TVPA. That doctrine "'makes a commander liable for acts of his subordinates, even where the commander did not order those acts, when certain elements are met.'" *Mamani v. Berzain*, 21 F. Supp. 3d 1353, 1375 (S.D. Fla. 2014) (quoting *Ford v. Garcia*, 289 F.3d 1283, 1286 (11th Cir. 2002)).

Under that theory, a person "subjects" another person to torture by exercising the rights and responsibilities of a military commander in charge of the torturers. It requires a power structure between the superior and the subordinate. The elements include:

> (1) a superior-subordinate relationship between the defendant/military commander and the person or persons who committed human rights abuses; (2) the defendant/military commander knew, or should have known, in light of the circumstances at the time, that subordinates had committed, were committing, or were about to commit human rights abuses; and (3) the defendant/military commander failed to take all necessary and reasonable measures to prevent human rights abuses and punish human rights abusers.

*Chavez*, 559 F.3d at 499; *see also Mamani v. Sanchez Bustamante*, 968 F.3d 1216, 1239 n.24 (11th Cir. 2020); *Mamani v. Berzain*, 825 F.3d 1304, 1312 n.3 (11th Cir. 2016); *Doe v. Drummond Co.*, 782 F.3d 576, 609 (11th Cir. 2015); *Ford ex rel. Est. of Ford v. Garcia*, 289 F.3d 1283, 1288–93 (11th Cir. 2002); *Chowdhury*, 746 F.3d at 53 ("Agency law . . . can provide a theory of tort liability if a defendant did not personally torture the victim."). The doctrine

covers not hitting the brakes (that is, failing to "prevent human rights abuses"), as well as hitting the accelerator (that is, ordering the torture).

If *Mohamad* did not expressly adopt command responsibility, it came an inch away. The Supreme Court in *Mohamad* relied on the Sixth Circuit's decision in *Chavez*, and *Chavez* involved command responsibility. So a superior who orders a subordinate to torture an individual has "subject[ed]" that person to torture. *See* 28 U.S.C. § 1350 note § 2(a)(1).

The key requirement is control. The individual must have had control over the person who did the deed. The defendant must have the "'material ability to prevent the crimes and to punish the perpetrators thereof'" – just like a military commander. *See Drummond Co.*, 782 F.3d at 610 (quoting *Ford*, 289 F.3d at 1291).

A plaintiff "must allege facts plausibly suggesting that the defendants had 'effective control' over the perpetrators." *Id.* at 609 (quoting *Ford*, 289 F.3d at 1290). "Thus, a civilian superior – including a civilian corporate officer – could *feasibly* be held liable under the doctrine provided the plaintiffs demonstrated a superior-subordinate relationship between the civilian and the perpetrator, averring that the civilian was in the requisite position of authority and control." *Id.* (emphasis in original).

The command responsibility theory does not get Reynolds very far. The complaint does not allege that Higginbottom had a superior-subordinate relationship with President Mugabe or the Zimbabwe government. The complaint does not allege that Higginbottom controlled the Zimbabwe security forces. And it does not allege that Higginbottom ordered anyone to torture Reynolds.

At most, the complaint alleges that Higginbottom paid to have Reynolds arrested and, by implication, tortured. The complaint alleges that Higginbottom financed the mistreatment. "The

operation to discredit and incarcerate Plaintiff was solely financed by Higginbottom as documented by banking, telephonic communications and email communications which resulted in the planning of the trumped up false charges against the Plaintiff; filing alleged visa violation; espionage charge; subsequent atrocities; arrest and torture of Plaintiff all under the color of law of Zimbabwe." *See* Cplt., at ¶ 57 (Dckt. No. 48). The complaint expressly alleges aiding and abetting: Higginbottom "was instrumental, initiated, aided and abetted in the acts and the atrocities alleged in this Complaint against plaintiff." *Id.* at ¶ 7.

Providing financial support is not a natural fit within the parameters of the command responsibility doctrine. The doctrine requires a "superior-subordinate relationship," and the top dog must be someone akin to a "defendant/military commander." *Chavez*, 559 F.3d at 499. A financier is a lot of things, but most people probably don't think about them as military commanders. Bankrolling conduct isn't the same thing as ordering conduct. The ability to pull purse strings goes only so far.

For that reason, cases involving the command responsibility doctrine typically involve a traditional military relationship, or something close to a general-subordinate relationship. *See Doe v. Qi*, 349 F. Supp. 2d 1258, 1328–31 (N.D. Cal. 2004); *Giraldo v. Drummond Co., Inc.*, 2013 WL 3873965, *4 (N.D. Ala. 2013) ("But no court, in any jurisdiction, has ever extended the doctrine of [command] responsibility in ATS and/or TVPA cases to the corporate officers of private companies. That is because command responsibility is a military doctrine. The theory has only been extended to civilians where those individuals had authoritative control over state-run military or public forces.") (citations omitted); *In re S. African Apartheid Litig.*, 617 F. Supp. 2d 228, 271 (S.D.N.Y. 2009) (explaining that command responsibility is the military analogue to holding a principal liable for the acts of an agent).

24

The complaint at hand includes no such facts. There are no allegations that Higginbottom or the other Chicago Defendants ordered anyone in Zimbabwe to torture Reynolds. The complaint alleges no facts showing that Higginbottom had operational control over the prison guards who allegedly tortured him. And there are no allegations that Higginbottom and the others had that type of sway over President Mugabe, a ruthless dictator. At best, Higginbottom may have had influence, but influence is a far cry from command over the security forces of a foreign country.

And even if financial support could count, the connection between the bribes and the torture was too attenuated to support a claim. *See Penaloza v. Drummond Co.*, 384 F. Supp. 3d 1328 (N.D. Ala. 2019) (concluding that a "once removed" command theory was "simply too attenuated to support liability"); *see also Doe v. Drummond Co.*, 782 F.3d 576, 610 n.47 (11th Cir. 2015) ("Of course, the other requirements of the TVPA must be satisfied as well, and there are additional hurdles that could prove prohibitive for future plaintiffs proceeding on such a [command responsibility] theory. For example, . . . if the secondary liability of the superior must rest on another secondary liability theory, the application of the doctrine may be too attenuated or the act too remote to support liability."). The complaint does not allege that Higginbottom had financial control over the torturers.

The other theoretical possibility is aiding and abetting liability. Aiding and abetting liability is a means to allocate secondary responsibility for another person's primary tort. *See Halberstam v. Welch*, 705 F.2d 472, 476–78 (D.C. Cir. 1983); *see also* Restatement (Second) of Torts § 876 (1979). Reynolds argues that Higginbottom and the others bear responsibility for his torture by aiding and abetting the abuse by the Zimbabwe security forces.

Aiding and abetting is a familiar part of criminal law. Congress adopted a general statute about aiding and abetting liability in the criminal context. *See* 18 U.S.C. § 2(a) ("Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.").

But in civil cases, unlike criminal cases, "there is no general presumption that the plaintiff may also sue aiders and abettors." *See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 182 (1994). In the civil context, a few statutes impose liability for aiding and abetting, but relatively speaking, they are few and far between. Congress has taken a statute-by-statute, one-step-at-a-time approach.

Examples of provisions that create aiding and abetting liability appear in the Packers and Stockyards Act, the Internal Revenue Code, the National Bank Act, the Federal Reserve Act, and the Commodity Exchange Act. *See, e.g.*, 7 U.S.C. § 192(g) ("It shall be unlawful for any packer or swine contractor with respect to livestock, meats, meat food products, or livestock products in unmanufactured form, or for any live poultry dealer with respect to live poultry, to . . . (g) Conspire, combine, agree, or arrange with any other person to do, or aid or abet the doing of, any act made unlawful by subdivisions (a), (b), (c), (d), or (e)."); 26 U.S.C. § 6701 (imposing liability on any person "who aids or assists in, procures, or advises with respect to, the preparation or presentation of any portion of a return"); 12 U.S.C. § 93(b)(8) ("For purposes of this section, the term 'violate' includes any action (alone or with another or others) for or toward causing, bringing about, participating in, counseling, or aiding or abetting a violation."); 12 U.S.C. § 504(h) (same); 7 U.S.C. § 25(a)(1) ("Any person (other than a registered entity or registered futures association) who violates this chapter or who willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter shall be liable for actual

26

damages . . . .").  Also, Congress expressly authorized the SEC (but not private litigants) to bring aiding and abetting claims in certain types of cases.  *See* 15 U.S.C. §§ 77o(b), 78t(e).

Another good example is the Anti-Terrorism Act.  Congress expressly carved a foothold for aiding and abetting liability in the statutory text.  That statute imposes liability on "any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism."  *See* 18 U.S.C. § 2333(d)(2). Courts recognize aiding and abetting liability under that statute for a simple reason:  Congress put it in the text.  *See, e.g.*, *Gonzalez v. Google LLC*, 2 F.4th 871, 901–02 (9th Cir. 2021); *Retana v. Twitter, Inc.*, 1 F.4th 378, 382 (5th Cir. 2021); *Siegle v HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 223 (2d Cir. 2019); *see also Halberstam*, 705 F.2d at 477.

The Supreme Court underscored the importance of a text-based approach in the leading case about aiding and abetting liability.  *See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994).  In *Central Bank*, a developer used an outdated, rosy appraisal for the value of land, which secured some bonds.  But land prices were falling, and the declining value called into question whether the project had complied with bond covenants.  The indenture trustee was aware of concerns about the accuracy of the appraisals, but did not create them (and thus had no primary liability).

When the issuer eventually defaulted, bond purchasers sued the trustee under section 10(b) of the Securities Exchange Act of 1934, alleging aiding and abetting liability.  So the question was whether the trustee could have secondary liability.

The Supreme Court hewed to the text of the statute and concluded that Congress did not authorize claims for aiding and abetting.  The Supreme Court pointed out that section 10(b), unlike other statutes, failed to include any language about secondary liability.  "Congress knew

how to impose aiding and abetting liability when it chose to do so." *Id.* at 176. "If, as respondents seem to say, Congress intended to impose aiding and abetting liability, we presume it would have used the words 'aid' and 'abet' in the statutory text. But it did not." *Id.* at 177.

That conclusion was "uncontroversial" because the statutory text lacked any foundation for aiding and abetting liability. *Id.* "It is inconsistent with settled methodology in § 10(b) cases to extend liability beyond the scope of conduct prohibited by the statutory text." *Id.* And courts "cannot amend the statute to create liability for acts that are not themselves . . . within the meaning of the statute." *Id.* at 177–78.

Recognizing aiding and abetting liability in the face of statutory silence would lead to a "vast expansion of federal law." *Id.* at 183. The Supreme Court declined to take that step without an "expression of congressional direction to do so." *Id.*

The Seventh Circuit reached the same conclusion when interpreting the Anti-Terrorism Act in *Boim v. Holy Land Foundation for Relief & Development*, 549 F.3d 685 (7th Cir. 2008). At that time (it was later amended to expressly include aiding and abetting liability), the statute authorized a suit by "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism" to sue for treble damages in federal court. *See* 18 U.S.C. § 2333(a) (1994), *amended by* 18 U.S.C. § 2333 (2016), *and* 18 U.S.C. § 2333 (2018).

Applying *Central Bank*, the Seventh Circuit ruled that the statute did not create aiding and abetting liability. "Section 2333 does not say that someone who assists in an act of international terrorism is liable; that is, it does not mention 'secondary' liability." *Boim*, 549 F.3d at 689. The statute was silent on secondary liability, and "statutory silence on the subject of secondary liability means there is none." *Id.* Reading a silent statute to create liability would

28

"enlarge the federal courts' extraterritorial jurisdiction." *Id*. at 689–90. Expanding statutes is the business of Congress, not the courts.

The same result applies here. The TVPA does not say that someone who assists with torture is liable. Congress created liability for an individual who "subjects" another person to torture, but stopped short of including language about aiding and abetting. *See* 28 U.S.C. § 1350 note § 2(a)(1). "Congress took care to delineate the TVPA's boundaries." *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1403 (2018). "The TVPA reflects Congress' considered judgment," and "[a]bsent a compelling justification, courts should not deviate from that model." *Id.*

When courts hear a request to forge a new cause of action, "separation-of-powers principles are or should be central to the analysis." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017). "The question is 'who should decide' whether to provide for a damages remedy, Congress or the courts?" *Id.* And the "answer most often will be Congress." *Id.*

"The Court's recent precedents cast doubt on the authority of courts to extend or create private causes of action even in the realm of domestic law, where this Court has 'recently and repeatedly said that a decision to create a private right of action is one better left to legislative judgment in the great majority of cases.'" *Jesner*, 138 S. Ct. at 1402 (quoting *Sosa v. Alvarez-Machain*, 542 U.S. 692, 727 (2004)); *see also Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 67 n.3 (2001) ("[W]e have retreated from our previous willingness to imply a cause of action where Congress has not provided one."); *Nestlè USA, Inc. v. Doe*, 141 S. Ct. 1931, 1943 (2021) (Gorsuch, J., concurring) ("But the power to create a cause of action is in every meaningful sense the power to enact a new law that assigns new rights and new legally enforceable duties. And our Constitution generally assigns *that* power to Congress. A self-governing people depends on elected representatives – not judges – to make its laws.") (emphasis in original).

Nothing about a claim under the TVPA suggests that courts should be *more* willing – outside the "realm of domestic law" – to recognize an implied cause of action for aiding and abetting. *See Jesner*, 138 S. Ct. at 1402. Quite the opposite. A claim under the TVPA necessarily involves someone acting under authority or color of law of a foreign nation. The topic implicates foreign affairs, and in that arena, courts must stay in their lane and avoid overstepping. *See Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) (Jackson, J.) (recognizing that foreign policy issues are "delicate, complex, and involve large elements of prophecy" for which "the Judiciary has neither aptitude, facilities[,] nor responsibility").

"The political branches, not the Judiciary, have the responsibility and institutional capacity to weigh foreign-policy concerns." *Jesner*, 138 S. Ct. at 1403; *see also Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 116 (2013) (warning against "the danger of unwarranted judicial interference in the conduct of foreign policy"); *Hernandez v. Mesa*, 140 S. Ct. 735, 748 (2020) ("Where Congress has not spoken at all, the likelihood of impinging on its foreign affairs authority is especially acute."); *Sosa*, 542 U.S. at 727 ("[T]he potential implications for the foreign relations of the United States of recognizing such causes should make courts particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs."). In light of the sensitivities of foreign affairs, "Congress, not the Judiciary, must decide whether to expand the scope of liability." *Jesner*, 138 S. Ct. at 1405.

The Eleventh Circuit has landed in a different place, concluding that the TVPA covers claims for aiding and abetting. *See Mamani v. Sanchez Bustamante*, 968 F.3d 1216, 1220 (11th Cir. 2020); *Doe v. Drummond Co.*, 782 F.3d 576, 603 (11th Cir. 2015); *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1158–59 (11th Cir. 2005). The Eleventh Circuit reached that conclusion

after looking to legislative history and general principles of tort law. *See, e.g.*, *Drummond Co.*, 782 F.3d at 607 ("Importantly, the TVPA and its legislative history in no way disavow reliance on traditional theories of tort liability for secondary actors under the TVPA. . . . To the contrary, the legislative history endorses an expansive view of liability under the TVPA . . . .").[3]

The statutory text, *Central Bank*, and *Boim* compel this Court to reach a different conclusion. Nothing in the text of the TVPA creates aiding and abetting liability. *See Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 87 (D.C. Cir. 2011), *vacated on other grounds*, 527 F. App'x 7 (D.C. Cir. 2013) (Kavanaugh, J., dissenting) ("But the text of the TVPA does not provide for aiding and abetting liability, and the Supreme Court has made crystal clear that there can be no civil aiding and abetting liability unless Congress expressly provides for it."). Without a textual basis for secondary liability, there is no secondary liability.

In sum, the complaint fails to state a claim that the Chicago Defendants subjected Reynolds to torture within the meaning of the TVPA.

### C.    Torture Under the TVPA

Finally, the Chicago Defendants argue that Reynolds's mistreatment in jail did not amount to torture under the TVPA. As the motion to dismiss is granted, the Court declines to address this argument.

### Conclusion

The motion to dismiss is granted. The claims against the corporate Chicago Defendants are dismissed with prejudice. The claims against the individual Chicago Defendants (Higginbottom, Scardino, and Girzades) are dismissed without prejudice.

---

[3] Other circuits have acknowledged the issue, but not reached it. *See, e.g.*, *Chen Gang v. Zhao Zhizhen*, 799 F. App'x 16, 18 (2d Cir. 2020); *Sikhs for Just. Inc. v. Gandhi*, 614 F. App'x 29, 31 (2d Cir. 2015); *Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 58 & n.49 (D.C. Cir. 2011), *vacated on other grounds*, 527 F. App'x 7 (D.C. Cir. 2013).

Date:   March 23, 2022

Steven C. Seeger
United States District Judge